UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| HAI K. NGUYEN, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 3:18-cv-00871 |
| PRISONER TRANSPORTATION SERVICES, *et al.*, | ) ) ) ) | Judge Trauger |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Hai K. Nguyen, an inmate of the New Jersey State Prison in Trenton, New Jersey, filed this pro se, in forma pauperis action under 42 U.S.C. § 1983 against Prisoner Transportation Services, LLC, John Does #1-6, and Jane Does #7-11, alleging violations of the plaintiff's civil and constitutional rights. (Doc. No. 1).

The complaint is before the court for an initial review pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. §§ 1915(e)(2) and 1915A.

**I.    Prison Litigation Reform Act Screening**

Under 28 U.S.C. § 1915(e)(2)(B), the court must dismiss any portion of a civil complaint filed in forma pauperis that fails to state a claim upon which relief can be granted, is frivolous, or seeks monetary relief from a defendant who is immune from such relief. Section 1915A similarly requires initial review of any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," *id.* § 1915A(a), and summary dismissal of the complaint on the same grounds as those articulated in § 1915(e)(2)(B). *Id.* § 1915A(b).

1

The court must construe a pro se complaint liberally, *United States v. Smotherman*, 838 F.3d 736, 739 (6th Cir. 2016) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)), and accept the plaintiff's factual allegations as true unless they are entirely without credibility. *See Thomas v. Eby*, 481 F.3d 434, 437 (6th Cir. 2007) (citing *Denton v. Hernandez*, 504 U.S. 25, 33 (1992)). Although pro se pleadings are to be held to a less stringent standard than formal pleadings drafted by lawyers, *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991), the courts' "duty to be 'less stringent' with pro se complaints does not require us to conjure up [unpleaded] allegations." *McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir. 1979) (citation omitted).

## II.  Section 1983 Standard

Title 42 U.S.C. § 1983 creates a cause of action against any person who, acting under color of state law, abridges "rights, privileges, or immunities secured by the Constitution and laws . . . ." To state a claim under Section 1983, a plaintiff must allege and show two elements: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of state law. *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009)(quoting *Sigley v. City of Panama Heights*, 437 F.3d 527, 533 (6th Cir. 2006)); 42 U.S.C. § 1983.

## III.  Alleged Facts

The complaint concerns the plaintiff's transport from New Jersey to California and back in a van operated by Prisoner Transportation Services, LLC ("PTS"). On September 18, 2017, the plaintiff was picked up in New Jersey for extradition to California by two unidentified transport officers (defendants John Doe #1 and #2), employees of PTS. (Doc. No. 1 at 4). The officers

strip-searched the plaintiff and placed him in full shackle restraints. The plaintiff told the officers that he had a prostrate problem and needed to urinate frequently. The officers placed the plaintiff in a small cargo van with other prisoners. He requested to be buckled in, and the officers told him it was "unnecessary." (*Id*.) After a few hours of traveling, the plaintiff slid off the seat onto his tailbone due to sharp turns. He complained, but the officers told him he would be alright.

The following day, the plaintiff requested to be buckled in again, reminding the officers that he had been injured the day before when he slid off the seat. John Doe #1 said, "Stop being a baby." (*Id*. at 5). The driver responded with a "'rough ride assault,' a tactic used by law enforcement to punish prisoners while being transported." (*Id*.) The van rapidly accelerated, suddenly stopped, and took violent sharp turns. This "rough ride assault" slammed the plaintiff into the walls of the van and he slid off his seat several more times, "directly landing on his tailbone." (*Id*.) The plaintiff notified John Doe #1 and #2 of his fall, but John Doe #1 threatened the plaintiff with "keep bitching and I'll make sure I break something when you fall the next time." (*Id*.) For another hour, the plaintiff slid off the seat several more times and sustained a lower back injury.

During transport, the air conditioning often malfunctioned and the plaintiff experienced "extreme heat and lack of oxygen." (*Id*. at 6). The officers ignored the plaintiff's repeated requests to stop for a restroom break. The officers told the plaintiff that they "cannot give restroom breaks until they reached the next pick-up/drop-off facility" and then "it would be up to that facility" to allow use of their bathroom. (*Id*. at 6-7). The plaintiff was forced to urinate in water bottles, on the floor, and even on himself because the officers would not stop for restroom breaks. The plaintiff was told by other prisoner-passengers that he lost consciousness "several times" due to

the conditions of confinement. (*Id*. at 6). The plaintiff endured these conditions for 48 hours until the van reached the next holdover facility in Kentucky. At the Crittenden County Detention Center, the plaintiff informed officials about his injuries and asked to see a nurse. A nurse documented his medical concerns and gave him ibuprofen to help with the pain.

The following day, two different PTS transport officers (John Doe #3 and #4) picked up the plaintiff. He informed them of his back injury and they told him they were not doctors and could not do anything for him. During numerous pick-ups and drop-offs, the plaintiff complained that his back pain was intensifying, but the officers ignored his complaints. During his stop at a holdover facility in Teller County Jail, Colorado, the plaintiff sought medical treatment but a nurse, Jane Doe #7, told him that she could not do anything for PTS prisoners and to "[j]ust drink lots of water." (*Id*. at 8). That night, the plaintiff "endured excruciating pain" and had to be helped to his cell by another prisoner because he could not walk on his own. (*Id*.)

The following day, while John Doe #3 and #4 were shackling the plaintiff, the plaintiff told them that he needed medical attention for his back and leg pain. They ignored him. During the trip, the plaintiff made additional requests for medical attention, which the officers also ignored. At the next holdover facility in Nye County Jail, Nevada, the plaintiff sought medical treatment and the nurse, Jane Doe #8, told the plaintiff that she could not do anything for PTS prisoners. The plaintiff continued to complain and ultimately received some ibuprofen from a doctor and different nurse.

The entire trip from New Jersey to California lasted fifteen days. After arriving in Sacramento, California, the plaintiff sought and received medical treatment for injuries he sustained during the cross-country transport. While the plaintiff was in California, his family

members contacted PTS to inform it of the plaintiff's back injury and to request that he be flown back to New Jersey. They received no response.

On or about January 26, 2018, the plaintiff was picked up by PTS employees John Doe #5 and #6 and placed in restraints in a cargo van without lights for the return trip to New Jersey. The plaintiff informed the officers of his back problem, his need to urinate frequently, and the two medications that he needed to take daily. John Doe #6 assured the plaintiff that he would make sure John Doe #5 knew.

During the drive, the plaintiff sought medical attention due to pain and the officers told him "that it will only be a few hours until the next holdover facility." (*Id*. at 11). However, at the next holdover facility, the plaintiff did not receive any treatment, having been told by Jane Doe #9 that she "can't give PTS prisoners anything at all." (*Id*.)

The following day, the trip resumed. The prisoners were transported cross-country in the cargo area with trash up their knees, urine in bottles and on the floor, and unbearable odors and heat. John Doe #6 said: "I know, I treated prisoners in Iraq better than you guys get treated." (*Id*. at 12). At several points during the trip, prisoners began screaming, kicking, and banging the walls of the van because one of the prisoners became unresponsive. The van finally stopped and John Doe #6 opened the back door and said "stop fucking around or else you will be eating bologna sandwiches for the rest of the trip." (*Id*.) However, when John Doe #6 saw the ailing prisoner, he went to get John Doe #5, and they called an ambulance to take the semi-conscious and incoherent prisoner to the hospital.

After the drive resumed, another prisoner began having "some kind of psychiatric episode" and "became aggressive inside the van at other prisoners." (*Id*. at 13). The officers refused to stop, and the plaintiff sustained minor injuries as a result of the prisoner's behavior. At that point, the officers began another "rough ride assault" and, as a result, the plaintiff was thrown "all over the place," bumping his head and shoulders and sustaining injuries that continue to cause pain, numbness, and tingling in his left shoulder and arm. (*Id*. at 14). In addition, the plaintiff's existing back injury was worsened.

When the van reached the next holdover facility, the plaintiff sought and did not receive medical attention and linens. Nurse Jane Doe #10 told the plaintiff that "your transport officers told us NOT to give you guys anything" so "I can't do anything for you." (*Id*. at 15). The following day, the plaintiff and other prisoners were returned to the van for further transport. The plaintiff requested his medications and the officers ignored him. He sought bathroom breaks but did not receive them. As a result, he urinated into bottles, on the floor, and on himself. One prisoner defecated on himself and, when John Doe #6 heard about the incident, he stated, "You are lucky I'm not sitting back there with you because I would fuck you up for that nasty shit!" (*Id*. at 15).

At the next holdover facility in Missouri, the plaintiff asked Jane Doe #11 for medical attention and she denied his request, saying "you look fine to me." (*Id*. at 16). For the remainder of the trip, the plaintiff endured the pain from his injuries without complaint out of fear of retaliation by the officers. He was not given his medications. He arrived in New Jersey on February 4, 2018. Shortly after his arrival, he contacted the medical department, who examined the plaintiff. He was given two x-rays and transported to an outside hospital for an MRI. On

August 13, 2018, a physician informed the plaintiff that he had injuries to his C4 and C5 vertebrae, irregular spacing, spinal stenosis, and protrusion. The plaintiff was told that he would be referred to a neurosurgeon for further treatment.

## IV. Analysis

The complaint alleges that Prisoner Transportation Services is located in Nashville, Tennessee, and acted "under color of law" in all matters pertinent to this action. (Doc. No. 1 at 1, 18). The complaint further alleges that its Chief Executive Officer (CEO), to be named upon discovery, resides in Nashville, Tennessee. (*Id*. at 1). Because the complaint alleges that the corporation is based in Nashville, Tennessee, and its as-yet-unidentified CEO resides in Nashville, Tennessee, venue is appropriate in this district. 28 U.S.C. § 1391(3).

Although Prisoner Transportation Services is a private company, it was performing an "exclusive government function," something it could not have done without authorization from the state. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982). Therefore, the court will assume for purposes of the required PLRA screening that Prisoner Transportation was operating as a state actor in this situation. *See Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 71 n.5 (2001) ("state prisoners already enjoy a right of action against private correctional providers under 42 U.S.C. § 1983"); *Street v. Corrs. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Various district courts have allowed plaintiffs to proceed in claims brought pursuant to § 1983 against private corporations that provide prison transport services. *See, e.g., Dykes v. Inmate Servs. Corp.*, No. 9:14-cv-3609-RMG-MGB, 2017 WL 9286983, at *25 (D. S.C. Jan. 23, 2017) (recommending the denial of summary judgment and finding that defendant prisoner transport service was a state actor because it contracted with state agency to transport persons in custody to another detention

7

facility); *Lewis v. Extradition Transport of Am.,* No. CV 13-138-M-DWM-JCI, 2014 WL 494573, at *4 & n.2 (D. Mon. Feb. 5, 2014) (presuming that Extradition Transport was operating as a state actor for § 1983 purposes); *Schilling v. TransCor America, LLC*, No. C 08-941-SI, 2008 WL 3463510 (N.D. Cal. Aug. 11, 2008) (allowing constitutional claims against private transport company to proceed without deciding state action issue); *Dailey v. Hunter*, No. 04-392, 2006 WL 4847739 (M.D. Fla. March 22, 2006) (plaintiff sufficiently pleaded that the defendant transport company acted under color of state law for § 1983 purposes based on the transport company's alleged contract for prisoner transportation with county jail); *Irons v. TransCor Am., Inc.*, No. 01-4328, 2006 WL 618856 (E.D. Pa. March 9, 2006) (denying summary judgment in § 1983 action because there existed a genuine issue of material fact as to whether the defendant transport company was a state actor since private prison companies obtain custody over prisoners only by way of state authorization and plaintiff established that "defendants exercised control over him comparable to incarceration"); *Wine v. Dep't of Corrs.*, No. 00-C-704-C, 2000 WL 34229819 (W.D. Wis. Dec. 27, 2000) (finding that it would be inappropriate to dismiss transport company as a defendant in § 1983 action because plaintiff had alleged facts sufficient to proceed against the transport company as a state actor).

The Eighth Amendment of the United States Constitution requires prison officials to ensure the "reasonable safety" of inmates. *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994). The Eighth Amendment "was designed to protect those convicted of crimes" and does not protect pre-trial detainees. *Ingraham v. Wright*, 430 U.S. 651, 664 (1977). It is unclear from the present record whether the plaintiff was a pre-trial detainee at the time of his transport. For the purposes of initial review, however, this is largely a distinction without a difference because the Due Process Clause

of the Fourteenth Amendment provides pre-trial detainees with rights analogous to those under the Eighth Amendment. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001).

The Constitution does not protect pre-trial detainees or prisoners from unpleasant prison experiences. *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir.1987). Nor does the Constitution mandate comfortable conditions of confinement. *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). It necessarily follows, then, that a pre-trial detainee or prisoner has not been subjected to cruel and unusual punishment simply because he has been made to feel uncomfortable during the course of a transfer from one prison to another. *See Waller v. Transcor Am.,* No. 3:07-0171, 2007 WL 3023827, at *6 (M.D. Tenn. Oct. 11, 2007) (citing *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir.1995) (a prisoner's mere discomfort, without more, does not offend the Eighth Amendment)).

However, the plaintiff here alleges that he suffered more than mere discomfort while being transported from New Jersey to California and back. He alleges that officers drove recklessly and dangerously on purpose, creating unsafe conditions for the occupants and resulting in specific physical injuries to the plaintiff. He also alleges that the conditions of confinement within the transport van were unsanitary and dangerous, as prisoners were forced to eliminate bodily waste on the floor, in bottles, and on themselves because the officers would not take enough hygiene breaks; the van lacked adequate ventilation and air conditioning, resulting in extreme temperatures and causing the plaintiff to lose consciousness on several occasions; the prisoners rode in complete darkness and in restraints for long periods of time; and the prisoners were forced to experience sleep deprivation. According to the complaint, when the plaintiff and other prisoners complained, the officers ignored, threatened, or ridiculed them and subjected them to "rough ride assaults." For purposes of the required PLRA screening, the court finds that these allegations state colorable

Eighth or Fourteenth Amendment claims[1] against PTS and against the John Doe officers in their individual capacities.

To establish a violation of his constitutional rights resulting from a denial of adequate medical care, a plaintiff must show that the defendants were deliberately indifferent to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Brooks v. Celeste*, 39 F.3d 125, 127 (6th Cir. 1994). "Deliberate indifference" is the reckless disregard of a substantial risk of serious harm; mere negligence, or even gross negligence, will not suffice. *Farmer*, 511 U.S. 825, 835-36; *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc); *Westlake v. Lucas*, 537 F.2d 857, 860-61 n.5 (6th Cir. 1976); *see also Estelle*, 429 U.S. at 105-06.

A claim of deliberate indifference to a prisoner's medical needs under the Eighth Amendment has both an objective and subjective component. *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014). A plaintiff satisfies the objective component by alleging that the prisoner had a medical need that was "sufficiently serious." *Id.* (quoting *Farmer*, 511 U.S. at 834). A plaintiff satisfies the subjective component "by alleging facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id*.

A prisoner's difference of opinion regarding diagnosis or treatment does not rise to the level of a constitutional violation. *Estelle*, 429 U.S. at 107. Further, when a prisoner has received some medical attention, but disputes the adequacy of that treatment, the federal courts are reluctant to second-guess the medical judgments of prison officials and constitutionalize claims that sound

---

[1]As noted above, because it is unclear from the present record whether the plaintiff was a pre-trial detainee or convicted prisoner at the time of his transport, the court is unable to determine at this time whether the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment applies.

in state tort law. *Westlake*, 537 F.2d at 860 n.5 (6th Cir. 1976). Finally, to set forth a viable claim for the denial of medical care, the plaintiff must argue that his health suffered as a consequence of such alleged denial. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 401 (6th Cir. 1999).

Here, the complaint alleges that the plaintiff sustained numerous injuries, including an injury to his tailbone, lower back, leg, and vertebrae during transport by defendants PTS and John Doe #1-6. For purposes of the PLRA screening, the court assumes that these injuries constitute sufficiently serious medical needs. *See Rouster*, 749 F.3d at 446.

As to the John Doe defendants' states of mind, the complaint alleges that these individuals refused to obtain medical treatment for the plaintiff even though, according to the complaint, the plaintiff repeatedly informed the officers of his health issues, sought medical treatment, and asked for his medications. As to the driving officers, the complaint alleges that they purposefully drove in such a way as to punish and injure the plaintiff when he asked for medical treatment or complained about the conditions of his confinement. The complaint further alleges that, each time the plaintiff arrived at various holdover facilities, defendants Jane Doe #7-11 denied him medical treatment because the PTS officers had instructed medical personnel not to provide any treatment to PTS prisoners as a matter of policy.

The court finds that these allegations, "if true, would show that the [defendants] being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that [they] did in fact draw the inference, and that [they] then disregarded that risk." *Id.* Consequently, the court finds that the complaint sets forth non-frivolous Eighth Amendment claims against the John and Jane Doe defendants in their individual capacities under § 1983 for deliberate indifference to the plaintiff's serious medical needs. Because the relationship between PTS and the medical providers

at the holdover facilities is unclear at this time, the court will not dismiss the official capacity claims against defendants Jane Doe #7-11, and these claims will proceed for further development of the record. Likewise, the court will not dismiss the claims against PTS at this time because the complaint alleges that the individual defendants acted pursuant to policies and customs created and/or implemented by PTS, such as a policy to disallow medical treatment for the prisoners it transports.

Although designation of "John Doe" or "Jane Doe" defendants is not favored, it is permissible when the defendants' identities are not known at the time the complaint is filed, but may be determined through discovery. *See Berndt v. Tenn.*, 796 F.2d 879, 882-84 (6th Cir. 1986). The court concludes that it would be inappropriate to dismiss the claims against the John Doe or Jane Doe defendants at this juncture because of the likelihood that the identities of these defendants will be determined during discovery.

Finally, the complaint alleges that the John Doe officers who orchestrated the "rough ride assaults" used excessive force against the plaintiff in violation of the Eighth Amendment. As noted above, it is unclear at this time whether the plaintiff was a pre-trial detainee or convicted prisoner at the time of the alleged use of excessive force. The legal status of an alleged victim of excessive force is significant because the conduct of the offending officer must be analyzed under the standard appropriate to the applicable constitutional provision. *See Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 538-39 (6th Cir. 2015) ("The Supreme Court has recently clarified . . . that when assessing pretrial detainees excessive force claims we must inquire into whether the plaintiff shows 'that the force purposefully or knowingly used against him was objectively unreasonable.'")

(quoting *Kingsley v. Hendrickson*, ___ U.S. ___, ___ 135 S. Ct. 2466, 2473, 192 L. Ed. 2d 416 (2015)).

The Fourteenth Amendment's Due Process Clause protects a pre-trial detainee from the use of excessive force that amounts to punishment. *See Kingsley*, 135 S. Ct. at 2473. A pre-trial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable in order to demonstrate that it was excessive in violation of the Fourteenth Amendment's Due Process Clause. *See id.* Under the Eighth Amendment, which applies to convicted prisoners, an officer's conduct will be found to amount to cruel and unusual punishment "when the[] 'offending conduct reflects an unnecessary and wanton infliction of pain.'" *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)). In examining an excessive force claim under the Eighth Amendment, the constitutional analysis has both a subjective and an objective component, requiring a court to determine "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," and whether "the pain inflicted was sufficiently serious." *Cordell*, 759 F.3d at 580 (internal quotation marks and citations omitted) (alteration added). The heightened Eighth Amendment standard acknowledges that "'[t]he maintenance of prison security and discipline may require that inmates be subjected to physical contact actionable as assault under common law.'" *Id.* (quoting *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002)) (alteration in original). In determining whether the force used was applied in a good faith effort to restore discipline or rather inflicted for a malicious purpose, it is "proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the

13

severity of a forceful response.'" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

"While the extent of a prisoner's injury may help determine the amount of force used by the prison official, it is not dispositive of whether an Eighth Amendment violation has occurred." *Cordell*, 759 F.3d at 581 (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)). "'When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . [w]hether or not significant injury is evident.'" *Cordell*, 759 F.3d at 581 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)) (alteration in original). A significant physical injury is not required to establish the objective component of an Eighth Amendment claim. *Wilkins*, 559 U.S. at 1178-79 ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). In the end, a determination of what constitutes "unnecessary and unwanton infliction of pain," is "contextual and responsive to contemporary standards of decency." *Hudson*, 503 U.S. at 8.

Applying the heightened Eighth Amendment standard for purposes of this initial review, the court finds that the complaint states colorable Eighth Amendment excessive force claims under § 1983 against the as-yet-unidentified defendant John Doe drivers in their individual capacities. The complaint alleges that these officers used "rough ride assaults" to punish and retaliate against the prisoners who complained or asked for assistance; according to the plaintiff, the use of force was not "applied in a good-faith effort to maintain or restore discipline" but was used "maliciously and sadistically to cause harm[,]" and "the pain inflicted was sufficiently serious." *Cordell*, 759

14

F.3d at 580 (internal quotation marks and citations omitted) (alteration added). These claims will proceed for further development.

**V.     Conclusion**

Having screened the complaint pursuant to the PLRA, the court finds that the complaint states colorable Eighth or Fourteenth Amendment claims under § 1983 against Prisoner Transport Services, LLC, and John Doe defendants #1-6 in their individual capacities; Eighth Amendment deliberate indifference to serious medical needs claims against PTS, John Doe defendants #1-6 in their individual capacities, and Jane Doe defendants #7-11 in their individual and official capacities; and Eighth or Fourteenth Amendment excessive force claims against the as-yet-identified John Doe van drivers in their individual capacities. These claims survive the required PLRA screening and shall proceed for further development. 28 U.S.C. § 1915A.

An appropriate order will be entered.

_____
Aleta A. Trauger
United States District Judge